NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| J.M. and M.M. o/b/o M.M., | Civil Action No. 10-cv-06660 (SDW) |
| Plaintiffs, | |
| v. | |
| MORRIS SCHOOL DISTRICT BOARD OF EDUCATION, | **OPINION** |
| Defendants. | December 23, 2011 |

**SUSAN D. WIGENTON**, U.S.D.J.

Before the Court is Morris School District Board of Education's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Motion for Summary Judgment" or "the Motion"). Also before the Court is J.M. and M.M.'s motion for summary judgment for attorney's fees, costs, and interest incurred from the administrative proceeding below and attorney's fees and costs arising from the instant action ("Plaintiffs' Motion"). The Court has jurisdiction, pursuant to 28 U.S.C. § 1331 (2006). Venue is proper pursuant to 28 U.S.C. § 1391 (2006). The Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, this Court **DENIES** Defendant's Motion for Summary Judgment and **AFFIRMS** the Administrative Law Judge's decision. Furthermore, this Court **GRANTS** Plaintiffs' Motion.

## I.    BACKGROUND

This matter involves J.M. and M.M. ("M.M. Sr."), on behalf of their daughter, M.M., ("Plaintiffs") and Morris School District Board of Education ("Defendant" or "the District").

M.M. is a twelve-year-old student who is eligible for special education and related services.  (*See* Compl. ¶ 3.)  Although Defendant is M.M.'s in-district education authority, Plaintiffs placed M.M. at the Winston School, an out-of-district special education school.  (*See* Compl. ¶ 4–5.)  On or about March 4, 2010, Plaintiffs requested a Due Process hearing, claiming that in-district placement was inappropriate and not reasonably calculated to confer significant and meaningful educational benefits upon M.M. and that appropriate educational placement was at the Winston School.   Hearings were held before Administrative Law Judge ("ALJ") Kelly J. Kirk on June 30, 2010, August 5, 2010, August 18, 2010, August 23, 2010, and August 25, 2010.

On November 24, 2010, ALJ Kirk ordered a new Individual Education Program (IEP) for M.M. to reflect her placement at the Winston School for the 2010–2011 school year.  (*See* ALJ Final Decision, Ex. A to Compl. ("ALJ Decision") at 35.)  The ALJ further ordered Defendants to reimburse Plaintiffs for the costs of M.M.'s placement at the Winston School, including tuition and transportation, for the 2009–2010 and 2010–2011 school years.  (*See id.*)

On December 21, 2010, Plaintiffs filed a complaint with this Court, seeking judgment of attorney's fees, costs, and interest incurred from the administrative proceeding below, and reasonable attorney's fees and costs arising from the instant action.  (*See* Compl. 3.)

Subsequently, on May 11, 2011, Defendants filed the instant Motion for Summary Judgment, appealing the ALJ's decision.

## II.   FACTS

*IEP Meeting for 2004-2005 School Year*

M.M. was enrolled in a mainstream kindergarten class in the district for the 2004–2005 school year.  (*See* ALJ Decision at 2.)  M.M.'s kindergarten teacher referred her for a complete child study team (CST) evaluation for academic and behavioral difficulties, and a possible

educational disability.  The CST evaluation proposed to assess M.M. in educational, psychological, and social history.  (*See* R-5.)[1]  M.M. also underwent an occupational therapy evaluation.  (*See id.*)

A psychological assessment showed that M.M. was functioning in the average range of overall cognitive ability, but her individual intelligence quotient (IQ) scores varied significantly and indicated an uneven pattern of development.  (*See* R-8.)

As part of her initial social assessment, the District referred M.M. for a neurological examination by Elliot Grossman, M.D.  Dr. Grossman determined that M.M. suffered from attention deficit hyperactivity disorder (ADHD), combined type.  He noted that M.M. had weaknesses in language arts, computation, and visual motor integration, which may, in part, have been related to the ADHD diagnosis.  (*See* R-10; R-11.)

An educational assessment was prepared using the Woodcock-Johnson III Tests of Achievement[2] and several other tests for written language, vocabulary and visual-motor integration.  M.M. scored in the low-average range for letter/word identification (24%), and in the average range for passage comprehension (37%), calculation (34%), applied problems (36%), writing samples (25%) and spelling (58%).

Finally, M.M.'s occupational therapy evaluation determined that M.M. exhibited delays in skills in several areas.  She experienced difficulty with sensory processing of the vestibular system, safety awareness, some task/organization skills, pencil grasp, and visual motor/perceptual skills.  The registered occupational therapist, Melinda Laureano, recommended certain services for a minimum of thirty minutes per six-day cycle.  (*See* R-16.)

---

[1] References to District's administrative exhibits are denoted with "R".  References to Plaintiff's administrative exhibits are denoted with "P".

[2] The test is used to "help assess students for learning disabilities and to determine if they need special services." Riverside Publishing, Woodcock-Johnson® III Normative Update (NU) Tests of Achievement, Forms A and B, *available at* http://www.riverpub.com/products/wjIIIAchievement/details.html.

A meeting was held on May 9, 2005 to discuss the results of the CST evaluations, determine eligibility, and possibly develop an individualized education program (IEP).  (*See* R-13.)  According to the Report of Eligibility Conference, M.M. was eligible for special education and related services based upon the category of Specific Learning Disability because results from the Woodcock-Johnson Test indicated a severe discrepancy between intellectual function and school performance in "basic reading skills" and "reading comprehension."  (*See* R-14.)  M.M.'s parents signed the Report of Eligibility Conference on June 3, 2005, but indicated that they were not in agreement with the eligibility determination.  (*See* ALJ Decision at 4.)

*IEP for 2007-2008 School Year*

M.M. was educated at the Frankfurt International School in Germany for first, second, and third grade.  (*See* ALJ Decision at 4.)  It was determined that M.M. would need a plan to supplement her educational needs, and she was given an IEP beginning in November 2006.  (*See id.*)  M.M.'s IEP for third grade (2007-2008) reflected the following support program: 20% Special Education Teacher (ELC, 4 times/week, 200 minutes).  (*See* R-18.)  M.M. nevertheless continued to have difficulties at the Frankfurt International School.  As such, her parents decided to have M.M. privately evaluated.  (*See* ALJ Decision at 4.)

*First Independent Evaluation*

On April 30, 2008, May 1, 2008, and May 2, 2008, M.M. was evaluated in Boston, Massachusetts by Lorna N. Kaufman, Ph.D. who prepared a psycho-educational evaluation ("Kaufman's Report").[3]  (*See* R-19 at 1.)  As part of the evaluation, Kaufman assessed M.M.'s

---

[3] In preparing M.M.'s psycho-educational evaluation, Kaufman administered the following tests: Boston Naming Test; Gray Oral Reading Test (GORT-4)—Form B; Lindamood Auditory Conceptualization Test; Parent Interview and Questionnaire; Record Review; Rey Osterreith Complex Figure Drawing; School Questionnaire; Test of Auditory Analysis Skills (TAAS); Test of Rapid Automatized Naming (RAN); Test of Written Language (TOWL3); Test of Visual Motor Integration (VMI); Wechsler Intelligence Scale for Children—Fourth Edition (WISC-4); Wide Range Assessment of Memory and Learning—Verbal Scale and Learning Scale (WRAML); Wilson Assessment of

general intellectual function using the Wechsler Intelligence Scale for Children—Fourth Edition ("WISC-4").  (*See id.*)  M.M. was determined to have exhibited superior to high average verbal reasoning ability (Verbal Comprehension Index Score: 126, 96th percentile), average perceptual reasoning ability (Perceptual Reasoning Index Score: 104, 61st percentile), average working memory (Working Memory Index Score: 99, 47th percentile), and high average processing speed (Processing Speed Index Score: 109, 73rd percentile).  (*See id.* at 3.)  According to Kaufman's Report, the "significant discrepancy" between M.M.'s index scores reflects her uneven cognitive development, and when children exhibit that level of discrepancy, a full-scale IQ score is not calculated because it is not a meaningful representation of intellectual ability.  (*See id.*)  Per Kaufman's assessment, M.M. struggles with spelling, written language and math calculations, and her decoding skills remain at the beginning stages of reading as she struggles to decode all words.  (*See id.*)  The results of Kaufman's evaluation indicated that M.M.'s cognitive and educational profiles are consistent with a diagnosis of severe language-based learning disability (dyslexia).  (*See id.* at 9.)  Her "triple deficit" with phonological processing, rapid word retrieval and verbal memory at the word and sound level was indicative of the severity of her dyslexia. (*See id.*)

Kaufman's evaluation was provided to Frankfurt International School by M.M.'s parents, and the school concluded that it was unable to support M.M.'s level of disability.  (*See* ALJ Decision at 5.)  M.M.'s parents requested permission to hire a special education teacher to tutor M.M. over the summer.  (*See id.*)  At the time, they were also planning their return to Morristown, New Jersey.  (*See id.*)

---

Decoding and Encoding (WADE); Woodcock Johnson Psychoeducational Battery Third Edition (WJIII)—Selected Subtests of Cognitive Ability and Academic Achievement—Form B.  (R-19 at 1.)

*IEP for 2008-2009 School Year*

Upon the family's return from Germany in late August 2008, Plaintiffs registered M.M. with the District.  (*See* ALJ Decision at 5.)  M.M.'s parents provided the District with Kaufman's Report, and requested that M.M. be placed at the Craig School because, according to Kaufman, the District could not provide a program appropriate for the severity of M.M.'s learning disabilities.  (*See id.*)

A CST evaluation meeting was held on September 8, 2008, at which time the District requested Plaintiffs' consent to speech/language and occupational therapy assessments of M.M. (*See* R-21, R-22.)  A Report of Eligibility Conference, dated September 8, 2008 (September 2008 Eligibility Report), which concerned the CST, states in pertinent part: [M.M.] was recently re-evaluated and the evaluator found that [M.M.'s] "cognitive and educational profile are consistent with the diagnosis of a severe language based learning disability (dyslexia)."  (*See* R-22.)  The September 2008 Eligibility Report also specifically states that the "District accepts the test results of the independent evaluator."  (*See id.*)

According to Nancy Helterman, the District's director of Pupil Services, in order to be classified under the category of Specific Learning Disability in the District, a student must have a 1.5 standard deviation discrepancy between his or her cognitive ability and a significant area of academic functioning.  (Transcript of Nancy Helterman, June 30, 2010 ("Helterman Tr. 06/30/2010") 30:12-19, 62:10-15.)  Based upon the Woodcock-Johnson III Test of Academic Achievement scores from Kaufman's Report, the District determined that a significant discrepancy existed between her cognitive ability and academic skills.  (*See* R-22.)  M.M.'s Basic Reading was 3.4 standard deviations below expectation based upon her IQ.  (*See* ALJ Decision at 5-6; *see also* R-22.)  Her Reading Comprehension was 3.13 standard deviations

below expectation based upon her IQ.  (*See* ALJ Decision at 5-6; *see also* R-22.)  Her Math

Calculation was 2.53 standard deviations below expectations based upon her IQ.  (*See* ALJ

Decision at 5-6; *see also* R-22.)  Her Spelling was 3.27 standard deviations below expectation

based upon her IQ.  (*See* ALJ Decision at 5-6; *see also* R-22.)  According to the IEP, M.M. was

determined eligible for special education services under the category of Specific Learning

Disability because of the significant discrepancy between her cognitive ability and academic

skills in the areas of reading, math calculation and spelling.  (*See id.*)  Her scores indicated a

severe discrepancy between intellectual function and school performance in basic reading skills,

reading comprehension, mathematical computation, and written expression.  (*See id.*)

The 2008-2009 IEP was developed in September 2008, and reflects that the special

education program to be implemented was as follows: daily out-of-class resource reading for the

entire period, daily in-class resource math for the entire period, and in or out-of-class general

support for a minimum of thirty minutes, a minimum of three times per month.  (*See* R-23 at 1.)

Related services were to be implemented out of class for a minimum of forty minutes, one time

per six-day cycle, though the IEP did not specify what services.  (*See id.*)  The IEP notes goals

and objectives for language arts, math, reading, and modifications/strategies.  (*See* R-23.)  It also

reflects that M.M. would take the District and State Assessment Program with accommodations

in language arts, mathematics, reading, science, and social studies.  (*See id.* at 10.)

M.M.'s parents agreed with the eligibility determination on September 11, 2008, subject

to their handwritten notation.[4]  (*See* R-23 at 16.)  Accordingly, the IEP was implemented.

Mary Elizabeth Bonkoski was M.M.'s special education teacher.  (*See* Transcript of Mary

Beth Bonkoski, June 30, 2010 ("Bonkoski Tr. 06/30/2010") 185:17-23, 188:16-23.)  Bonkoski

---

[4] The handwritten notation also stated, "However we reserve the right to request changes to the IEP at a later date."
(R-23 at 16.)

has a bachelor's degree in speech pathology and audiology, and holds certifications for elementary education and teacher of the handicapped. (*See id.* 182:5-15.) M.M. was placed in an inclusion mathematics class, and a replacement, or pull-out, small-group reading class. Bonkoski specifically worked with M.M. on math, reading and written responses within the reading curriculum. (*See* ALJ Decision at 7.) According to Bonkoski, M.M.'s accommodations were preferential seating, conferences with M.M. about difficulties, a slant board, a seat cushion and allowing her to stand. Per her IEP, M.M. was also given extended time on tests and classroom assignments, small-group testing, and a scribe for assignments other than spelling tests. (*See id.*)

Irene Gacki-Giuliano (Gacki) was M.M.'s fourth-grade general education teacher. (Transcript of Irene Gacki-Juliano [sic] June 30, 2010 ("Gacki Tr. 06/30/2010") 81:11-13.) She has a bachelor's degree in psychology and elementary education, and a master's degree in special education. (*See* R-60.) She holds a dual certification for general education and special education. (*See id.*) There were seventeen students in Gacki's fourth-grade class, five of whom were special education students. (Gacki Tr. 06/30/2010 84:16-22.) Gacki's class had one full-time, all-day assistant. (*See Id.* 88:4-15.)

*In-District Evaluations*

On September 9, 2008, Gacki completed a referral for an occupational therapy evaluation. (*See* R-23.) She noted that M.M.: had a tendency to confuse right and left; had poor desk posture; had trouble keeping hands to herself, would poke or push other children; and had difficulty reading or copying from the chalkboard. (*See id.*) Her checklist also noted M.M.'s problems with reading and spelling, and that she was distractible, restless, hyperactive, and had a short attention span. (*Id.*) On September 20, 2008, the District notified Plaintiffs that it

proposed to discuss occupational therapy services after the evaluation was completed.  (*See* R-25.)  It also noted that all other IEP components would remain the same.  (*See id*.)

M.M. was evaluated on September 18, September 25, and September 29, 2008 by Melinda Laureano, OTR, who prepared an Occupational Therapy Evaluation, dated October 8, 2008 (Laureano's Report).  (*See* R-24 at 1.)  At that time, M.M. was taking Adderall for ADHD once per day.  (*See id.*)  Laureano reviewed M.M.'s skills in the areas of fine motor skills, visual motor and visual perceptual skills, gross motor skills, and sensory processing.  (*See id*. at 2-4.)  Laureano concluded that M.M. exhibited delays in the visual motor and perceptual skill area, and was demonstrating a skill level almost two years behind her chronological age.  (*See id.* at 3.)  She also concluded that sensory processing concerns were found with sensation-seeking behaviors and difficulty with auditory filtering.  (*See id.* at 4.)  On October 20, 2008, Laureano prepared M.M.'s Occupational Therapy Progress Report Goals and Objectives for 2008-2009.  (*See* R-28.)

M.M. was also evaluated on September 12, October 1, and October 15, 2008 by Joanne Summer, MA, CCC-SLP, who administered several tests and prepared a Speech-Language Evaluation, dated October 15, 2008 ("Summer's Report").  (*See* R-27.)  Upon administering several tests, Summer noted that M.M.'s weaknesses were in the phonological section, with M.M. showing particular difficulty on the phonological segmentation and phonological blending subtests.  (*See* R-27 at 6; R-29 at 1-2.)  However, the District recommended against speech and language services for M.M.  (*See* R-29 at 1.)

On October 27, 2008, the District notified Plaintiffs that, as a result of M.M.'s evaluation, occupational therapy services would be provided to M.M. individually, in or out of class, once

per six-day cycle for a minimum of twenty minutes, and that all other components of the IEP would remain the same.  (*See* R-29 at 1.)

The District performed a Schools Attuned assessment in October 2008 to learn more about M.M.'s strengths and weaknesses and to develop goals for her teachers to utilize.  (*See* R-47.)  The assessment determined that M.M.'s attention difficulties were prominent and caused difficulties in her learning.  Additionally, on January 13 and January 14, 2009, Gacki and Bonkoski, respectively, completed a Clinical Attention Problem Scale and attachment.  (*See* R-30.)

M.M.'s parents requested an IEP meeting to address M.M.'s IEP and other issues, which was held on January 29, 2009.  In an e-mail dated February 27, 2009, M.M.'s parents requested a revised IEP to set forth goals and objectives, timelines for achieving those goals and objectives, and the criteria used to measure progress, in addition to documentable achievement.  (*See* R-31.)  M.M.'s caseworker, Donna Sjovall, responded to the e-mail on March 6, 2009.  (*See* R-32.)  As evidence of measurable progress and achievement, Sjovall noted the DRA2, Words Their Way Spelling Inventory, Writing Samples with rubrics and Everyday Math pre- and post-tests, and advised that Gacki would have the scores on those assessments at the next meeting.  (*See id.*)  Sjovall's response also stated that "[a]fter working with [M.M.], her teachers found that [M.M.'s] scores during Dr. Kaufman's evaluation were a low estimate of her ability."  (*See id.*)

Another IEP meeting was held on March 11, 2009, at which time the agenda was to explain the IEP process, progress reports and assessments, and to define the responsibilities of team members.  (*See* R-34.)

*Second Independent Evaluation*

On April 28, 2009, M.M. was observed by Ellen D. Fenster-Kuehl, Ph.D., licensed psychologist.  (*See* P-22.)  Dr. Fenster-Kuehl has a master's degree and doctorate in clinical psychology.  (*See id.*; *see also* Transcript of Ellen Fenster-Kuehl Aug. 18, 2010 ("Fenster-Kuehl Tr. 08/18/2010") 7:1-3.)  She administered a number of tests to assess M.M.'s verbal memory, visual memory, and attention/concentration (working memory), which she used to prepare a Cognitive and Psychological Evaluation, dated June 4, 2009 (Fenster-Kuehl's Report).  (*See* P-22.)

On May 1, 2009, M.M. was observed by Jeanne Tighe, M.A., CCC-SLP, speech language pathologist.  (*See* P-22.)  Tighe has a master's degree in speech language pathology, and has received training in the Orton-Gillingham program[5], Lindamood-Bell program[6], and various other speech and language programs.  (*See id.*)  She is also a Level One Wilson Certified Teacher.[7]  Tighe administered a number of tests[8] to M.M. and prepared a Speech and Language evaluation, dated May 11, 2009 (Tighe Report).  (*See id.*)

*2009 IEP Meeting*

An IEP meeting was held on June 4, 2009.  (R-41.)  As a result of an annual review, the CST proposed the following 2009-2010 school year IEP: daily out-of-class resource reading for the entire period, daily in-class resource math for the entire period, and in-or out-of-class general support for a minimum of thirty minutes, a minimum of three times per month.  (*See id.*)  Related services, specifically, small-group occupational therapy, were to be implemented out-of-class for

---

[5] Orton-Gillingham is a philosophy of literacy instruction for students with language-based learning disabilities.
[6] Lindamood-Bell is a program for students with learning disabilities.
[7] Wilson is an Orton-Gillingham-based multi-sensory reading program designed for students with dyslexia.
[8] Tighe administered the following tests to M.M.: Test of Language Competence—Expanded Edition; Test of Narrative Language; Comprehensive Test of Phonological Processing; Wilson Assessment of Decoding and Encoding (WADE); Test of Word Reading Efficiency; Gray Oral Reading Test-4 (GORT-4); Test of Reading Comprehension-3 (selected subtest); Test of Written Language (selected subtest).  (P-21 at 5.)

a minimum of twenty minutes, one time per six-day cycle.  (*See id.*)  The 2009-2010 IEP notes goals and objectives for language arts, math, reading, modifications, and also reflects behavioral interventions.  (*See id*.)

*Request for Out-of-District Placement*

On July 24, 2009, Plaintiffs' counsel forwarded Tighe's Report and Fenster-Kuehl's Report to the District's counsel, requesting that M.M. be placed out of district at the Winston School.  (*See* P-24.)  When the District failed to respond, Plaintiffs' counsel forwarded another letter to the District's counsel on August 17, 2009.  (*See* P-25.)  The second letter reiterated the request for out-of-district placement, and advised that if the District did not agree to such placement, it was the intention of M.M.'s parents to so place her and to seek reimbursement for tuition and transportation costs.  (*See id*.)

On August 19, 2009, the District's counsel responded, stating that while the District agreed that M.M. has a significant learning disability, the District's position was that its proposed 2009-2010 program was based upon its determination that the 2008-2009 program had provided M.M. with meaningful educational benefit.  (*See* P-26.)  The District offered to schedule a CST meeting to discuss the matter, including whether any changes to the current IEP were necessary.  (*See id.*)  Plaintiffs agreed to the meeting, but also proceeded with the unilateral placement of M.M. in September 2009.  (*See* P-27.)

An IEP meeting was held on September 21, 2009, at which time the District agreed to provide Plaintiffs with copies of assessments of M.M. that had been performed during the 2008-2009 school year.  (*See* ALJ Decision at 10.)  On October 20, 2009, a binder of pupil records

and explanatory materials were forwarded to Plaintiffs' counsel by the District counsel.[9]  (*See* R-51.)  Plaintiffs' counsel forwarded these materials to Tighe and Fenster-Kuehl for review.  Tighe and Fenster-Kuehl prepared responses to the District's materials on November 25, 2009 and January 10, 2010, respectively.  (*See id.*)  Plaintiffs' counsel forwarded their responses to the District's counsel on January 13, 2010, again requesting that the District place M.M. at the Winston School and reimburse the Plaintiffs for the unilateral placement.  (*See* P-34.)

On February 12, 2010, Plaintiffs' counsel forwarded a letter to the District's counsel advising that Plaintiffs had authorized counsel to file a Petition for Due Process.  (*See* P-35.)  On February 23, 2010, the District's counsel responded to the January 13, 2010 letter.  (*See* R-54.)

*Testimony at Due Process Hearing*

At the Due Process Hearing, M.M. Sr., Jeanne Tighe, and Ellen Fenster-Kuehl testified on behalf of Plaintiffs.  (*See* ALJ Decision 11.)  Nancy Helterman, Irene Gacki-Giuliano (Gacki), Mary Bonkoski, Donna Sjovall, and Celeste Hammell testified on behalf of Defendants.  (*See id.*)

## III.   LEGAL STANDARD

"New Jersey employs the one-tier administrative system, under which due process hearings are conducted before an administrative law judge of the New Jersey Office of Administrative Law."  *D.B. v. Ocean Twp. Bd. of Educ.*, 985 F. Supp. 457, 472 (D.N.J. 1997) (citing *Lascari v. Bd. of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist.*, 560 A.2d 1180, 1185 (N.J. 1989)).  Once an administrative law judge makes a determination in a due process hearing, any party has the right to appeal either in state court or federal district court.  *Id.* at 1184.  The reviewing court "shall receive the records of the administrative proceedings; shall

---

[9] Correspondence ensued between Plaintiffs and Defendant from June 2009 to February 2010 regarding the possibility of placing M.M. out of district.  (*See generally* ALJ Decision at 10-11.)  During this time, the District was often unresponsive to Plaintiffs' initial communications.

hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(i)-(iii) (2006).

When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as "modified *de novo*" review. *See P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009) (quoting *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 269-70 (3d Cir. 2003)). Under modified *de novo* review, a district court must give "due weight" and deference to the ALJ's findings. *Id.* (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). The ALJ's factual findings are considered "prima facie correct"; and where the reviewing court does not adhere to those findings, it must explain why. *Id.; see also Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 591-92 (3d Cir. 2000); *D.R. v. E. Brunswick Bd. of Educ.*, 109 F.3d 896, 898 (3d Cir. 1997); *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 527 (3d Cir. 1995).

Furthermore, when an ALJ has heard live testimony and has determined that one witness is more credible than another witness, the ALJ's determination is due special weight. *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). "Specifically, this means that a District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.'" *Id.* (quoting *Carlisle Area Sch.*, 62 F.3d at 529).

Under modified *de novo* review, a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate, including an award of attorney's fees, a requirement for reimbursement for a private educational placement, and a direction for the provision of a compensatory education. *See A.W. v. Jersey City Pub. Schs.*, 486

14

F.3d 791, 802 (3d Cir. 2007) (en banc); *Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1034 (3d Cir. 1993).

## IV.   DISCUSSION

### A.   *State Law*

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-87 (2006), ensures that all children with disabilities have available to them a free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living, and ensures that the rights of children with disabilities and parents of such children are protected. *See* 20 U.S.C. § 1400(d)(1)(A)-(B) (2006); N.J. Admin. Code § 6A:14-1.1 (West 2011).  A "child with a disability" includes children with intellectual disabilities, speech or language impairments, serious emotional disturbance, and specific learning disabilities, who, by reason thereof, need special education and related services.  20 U.S.C. § 1401(3)(A) (2006).  "Specific learning disability" refers to a disorder in one or more of the basic psychological processes involved in understanding or in using language (spoken or written), which may manifest itself in the "imperfect ability to listen, think, speak, read, write, spell or do mathematical calculations[,]" and includes such conditions as "perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia."  20 U.S.C. § 1401(30)(A)-(B) (2006).

States qualifying for federal funds under the IDEA must assure all children with disabilities the right to a "free appropriate public education."  20 U.S.C. § 1412(a)(1) (2006); *Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982).  Each district board of education is responsible for providing a system of free, appropriate special education and related services.  *See* N.J. ADMIN. CODE § 6A:14-1.1(d) (West 2011).  A "free appropriate public education" means special

education and related services that: (a) have been provided at the public's expense, under public

supervision and direction, and without charge; (b) meet the standards of the state educational

agency; (c) include an appropriate preschool, elementary school, or secondary school education

in the State involved; and (d) are provided in conformity with the individualized education

program required under 20 U.S.C. § 1414(d) (2006). *See* 20 U.S.C. § 1401(9) (2006); *Rowley*,

458 U.S. 176. Subject to certain limitations, FAPE is available to all children with disabilities

residing in the State between the ages of three and twenty-one, inclusively. *See* 20 U.S.C. §

1412(a)(1)(A)-(B) (2006).

Under the New Jersey Administrative Code, an "individualized education program" is

defined as "a written plan which sets forth present levels of academic achievement and

functional performance, measurable annual goals and short-term objectives or benchmarks."

N.J. ADMIN. CODE § 6A:14-1.3 (West 2011). It refers to an "integrated, sequential program of

individually designed instructional activities and related services necessary to achieve the stated

goals and objectives. This plan shall establish the rationale for [a] student's educational

placement, [and] serve as the basis for program implementation . . . ." *Id.*

At the beginning of each school year, the District must have an IEP in effect for every

student who is receiving special education and related services from the District. *See* N.J.

ADMIN. CODE § 6A:14-3.7(a)(1) (West 2011). Annually, or more often, if necessary, the IEP

team shall meet to review and revise the IEP and determine placement. *See* N.J. ADMIN. CODE §

6A:14-3.7(i) (West 2011). FAPE requires that the education offered to the child must be

sufficient to "confer some educational benefit upon the handicapped child," but it does not

require that the school district maximize the potential of disabled students commensurate with

the opportunity provided to non-disabled students. *Rowley*, 458 U.S. at 200. Hence, a

satisfactory IEP must provide "significant learning" and confer "meaningful benefit." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir. 2000).

In accordance with the IDEA, children with disabilities are to be educated in the least restrictive environment (LRE). *See* 20 U.S.C. § 1412(a)(5) (2006); N.J. ADMIN. CODE § 6A:14-1.1(b)(5) (West 2011). To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are to be educated with children who are not disabled. Further, special classes, separate schooling, or other removal of children with disabilities from the regular educational environment should occur only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. *See* N.J. ADMIN. CODE § 6A:14-4.2 (West 2011). The Third Circuit has interpreted this to require that a disabled child be placed in the LRE that will provide the child with a "meaningful educational benefit." *Kingwood Twp. Bd. of Educ.*, 205 F.3d at 578. Consideration is given to: (1) whether the student can be educated in a regular classroom with supplementary aids and services, (2) a comparison of benefits provided in a regular education class versus a special education class, and (3) the potentially beneficial or harmful effects which placement may have on the student with disabilities or other students in the class. *See* N.J. ADMIN. CODE § 6A:14-4.2(a)(8) (West 2011).

The District bears the burden of proof and the burden of production "[w]henever a due process hearing is held pursuant to the provisions of the [IDEA], . . . chapter 46 of Title 18A of the New Jersey Statues, or regulations promulgated thereto, regarding the identification, evaluation, reevaluation, classification, educational placement, the provision of a free, appropriate public education, or disciplinary action, of a child with a disability." N.J. STAT. ANN. § 18A:46-1.1 (West 2011).

B.    *ALJ's Findings*

The ALJ determined that the District's IEP: (1) was not appropriate to meet M.M.'s educational needs for the 2009–2010 school year, (2) did not provide her with a FAPE, and (3) did not provide for placement in the LRE that would provide M.M. with a meaningful educational benefit.  (*See* ALJ Decision at 33.)  The ALJ's finding was the same for the 2010-2011 school year because the District's plan for that year remained unchanged.  (*See id.*)

Though the ALJ did not come to a conclusion with regard to the adequacy of the Winston School, she determined that since the District failed to provide M.M. with a FAPE in the LRE, it was reasonable for Plaintiffs to unilaterally place M.M. at the Winston School for the 2009–2011 school years.  (*See id.*)

Thus, the ALJ concluded that the District should create an IEP within thirty days of the ALJ's decision to reflect that M.M. should be placed out of district at the Winston School for the 2010–2011 school year.  (*See id.*)

Since the District failed to provide M.M. with a FAPE, the ALJ concluded that the District should reimburse Plaintiffs for the cost of M.M.'s placement at the Winston School for the 2009–2010, as well as the 2010–2011 school years.  (*See id.*); *see also* 20 U.S.C. § 1412(a)(1)(C)(ii) (2006); *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000).

C.    *Parties' General Arguments*

i.    *Proposed IEP and District Placement*

At the due process hearing, the ALJ determined that the IEP in place, which included the Balanced Literacy Program (BLP) and Words Their Way (WTW), was inappropriate for M.M. in 2008-2009 and 2009-2010.  (*See* ALJ Decision at 12.)  The ALJ found that due to her learning

disability, M.M. required a program designed for students with severe dyslexia, and that neither BLP nor WTW were appropriate for M.M.'s degree of dyslexia.  (*See id.* at 14.)

First, Defendant claims that the ALJ overlooked the fact that the District specifically designed, through the IEP, a reading, writing, and literacy program for M.M. that worked.  (*See* Def. Br. 12; *see also* Def.'s Reply Br. 6.)  Second, Defendant contends that BLP and WTW were appropriate programs for M.M. in 2008-2009, and would have continued to be appropriate programs for her in 2009-2010.  In particular, Defendant claims that the WTW program was "individually tailored to every student, including dyslexic students whose needs are addressed by the program."  (*See* Def.'s Reply Br. 7.)  It further claims that individualized tutorial instructions were evidence of unique instruction.  (*See id.*); *see also Rowley*, 458 U.S. at 184.  Third, Defendant claims that there is no legal support to suggest that a reading program must expressly be designed for students with a particular disability in order to provide a "meaningful benefit." (*See* Def.'s Br. 14.)

Plaintiffs rebut Defendant's contention that M.M. progressed in her reading, writing, or spelling skills over the course of the fourth grade.  (*See* Pls.' Opp'n Br. 9.)  Plaintiff's note that expert testimony from Tighe illustrated that M.M.'s single word reading abilities and her connected reading abilities at the end of the fourth grade fell below the first percentile with both sight word reading and phonemic decoding reading.[10]  (*See* P-21.)  Plaintiffs also noted that between

---

[10] Tighe's testimony stated:

> It is shocking to find such an intelligent, well-spoken child scoring below the first percentile for both key types of word reading ability.  Many bright dyslexic children develop a large store of sight words that they can recognize as wholes, thereby alleviating the need to decode as frequently.  That M.M. has evidently not been able to do this attests to the profundity of her dyslexia.

Kaufman's assessment in 2008 and Tighe's assessment in 2009, M.M.'s reading abilities remained unimproved.

Furthermore, Plaintiff's noted that Kaufman assessed in 2008 that M.M.'s spelling skills were at a 1.8 grade equivalent.  (*See* Pls.' Opp'n Br. 12; R-19 at 7.)  A year after the IEP was implemented, Tighe assessed that M.M. could only spell out a sentence "that one would expect a late kindergarten or early first-grade student to be able to write."  (*See* Pls.' Opp'n Br. 12; *see also* P-21 at 14-15.)  Thus, not only did the IEP fail to assist M.M. in progressing, but M.M. demonstrated regression.  Regarding M.M.'s writing skills, Plaintiffs argue that the ALJ properly found that M.M.'s writing did not improve.  (*See* Pls.' Br. 12.)  Both Kaufman and Tighe administered the same Test of Written Language in 2008 and 2009.  In 2009, Tighe determined that M.M. could communicate functionally in writing.  (*See* P-21.)  Therefore, Defendant's argument regarding M.M.'s improvement in writing as well as reading and literacy are unavailing.

Federal law requires the District to provide a FAPE, which includes an "individualized education program."  20 U.S.C. § 1401(9) (2006); *Rowley*, 458 U.S. 176.  New Jersey's Administrative Code also requires an "individually designed instruction[][.]"  N.J. ADMIN. CODE § 6A:14-1.3 (West 2011).  A FAPE must be "tailored to the unique needs of the handicapped child" through the IEP.  *Fuhrmann ex rel. Fuhrmann  v. E. Hanover Bd. of Educ*., 993 F.2d 1031 (3d Cir. 1993) (quoting *Bd. of Educ. v. Diamond ex rel. Diamond*, 808 F.2d 987, 991 (3d Cir. 1986)).  In this instance, the District failed to provide individualized, tailored instruction to M.M. Rather, it used BLP and WTW, which are used for all students from kindergarten through the fifth grade.  (*See* R-43.)  Testimony from M.M.'s teachers, Gacki and Bonkoski, illustrated that these programs were not intended for students with dyslexia.

Defendant incorrectly suggests that *Rowley* holds that "individualized tutor instruction" evidences the existence of unique instruction.  Defendants offer little else but generalized statements that modifications were made to tailor the WTW program to M.M.'s special education needs.  (*See* Def.'s Reply Br. 7-10.)  Without more, this Court will not reverse the ALJ's finding that WTW was an inappropriate form of instruction considering the severity of M.M.'s dyslexia.

Furthermore, the IEP must be "likely to produce progress, not regression or trivial educational advancement."  *Bd. of Educ. of E. Windsor Reg'l Sch. Dist. v. Diamond*, 808 F.2d 987, 991 (3d Cir. 1986); *see also Rowley*, 458 U.S. at 181.  "Congress did not intend that a school system could discharge its duty under the Act by providing a program that produces some minimal educational benefit, no matter how trivial."  *Fuhrmann*, 993 F.2d at 1043.  In the instant matter, the evidence demonstrates that the District's IEP did not assist M.M. to progress in her reading or writing skills from 2008 to 2009, and that it actually permitted M.M. to regress in her spelling skills.  Thus, it is clear that the District had not designed an appropriate program for M.M.'s learning disability, and the program it did design was ineffective.  As a result, this Court agrees with the ALJ's determination that the in-District IEP was inappropriate.

ii.    *Diagnostic Reading Assessment (DRA2)*

The ALJ determined that while DRA2 testing may have provided M.M.'s teachers with some insight and information about M.M., the results were not a valid assessment of M.M.'s performance, nor were the results a reliable indicator of M.M.'s progress.  The ALJ based her finding upon three factors.  First, DRA2 was to be used for students in kindergarten through the third grade.  M.M. was in the fourth grade at the time.  Thus, the DRA2 was not technically meant to be used to assess M.M.  Second, the "Teacher Observation Guide" prompts the tester:

"If the student's score falls in a shaded area for either WPM (words per minute) or Accuracy, STOP! Reassess with a lower-level text."  M.M. was tested at level 14 on the DRA2 on both October 16, 2008 and January 29, 2009, during which there were no recordings within the shaded area.  When tested at level 24 in January 2009, M.M.'s WPM fell in a shaded area on the Oral Reading Fluency section.  Despite falling within the shaded area, the remaining sections of the test were nevertheless completed.  When tested at level 30 on June 5, 2009, M.M.'s scores for both WPM and Accuracy within the Oral Reading Fluency section fell in the shaded areas.  Again, remaining sections of the test were completed despite the instructions to stop and reassess.  (*See* R-35.)  Third, the ALJ heard testimony on the DRA2 from both Bonkoski and Tighe.  Bonkoski acknowledged that if a child drops below a certain level in that area, the administrator is supposed to discontinue the test and go to a lower level.  However, M.M. was permitted to read the book and complete the test because her teachers wanted to determine whether her miscues and fluency were affecting her comprehension.  Bonkoski found that M.M. "really could comprehend."  Tighe, on the other hand, opined that if a test is not administered according to protocol, it could not be relied upon.  She testified that if an examiner continues testing beyond the stopping point required by the test protocol, the scores obtained would be inflated, and the test could not be considered a valid assessment of the student's performance.  Furthermore, Tighe's testing of M.M. in May 2009 yielded results in stark contrast to the District's DRA2 results.  Tighe found that M.M. was "essentially unable to decode printed words at all," was scoring below the first percentile for both key types of word reading ability (sight word efficiency and phonemic decoding efficiency), and was unable to read even first-grade-level passages independently with any level of functional accuracy or fluency.

Defendant claims that the ALJ wrongly allowed Plaintiffs' experts, such as Tighe, to offer opinions on DRA2 testing because those experts lacked public school teaching experience. (*See* Def.'s Br. 15.)  In doing so, the District argues that the ALJ "completely discounted" the opinions of the District's personnel, who have worked with the assessment for years.  (*See id.*)

Plaintiffs rebut that the testing administration failed to adhere to testing protocol, thereby yielding invalid and unreliable results.  Thus, they argue that the ALJ correctly disqualified these scores as evidence of progress.  They also call attention to the fact that DRA2 was meant to test kindergarteners to third graders, not fourth grade students, such as M.M.

As discussed above, the standard of review requires this Court to accord the ALJ's determination special weight when she has heard live testimony.  *See D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553 (3d Cir 2010); *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).  This standard, compounded with the finding that proper protocol was not used to administer the correct test leads this Court to find that the ALJ determination was correct.  The DRA2 testing was not a valid assessment of M.M.'s progress.

### iii.     *New Jersey Assessment of Skills and Knowledge (NJASK)*

The NJASK is a state test for all third- and fourth-grade students, designed to measure how well children are achieving New Jersey's Core Curriculum Content Standards.  The proficiency levels for the NJASK are as follows: Partially Proficient (100-199); Proficient (200-249); and Advanced Proficient (250-300).  M.M.'s scaled scores were: Language Arts Literacy 200, Mathematics 200, and Science 246.  (*See* R-48.)  Gacki testified that M.M. scored proficient in Language Arts Literacy and Mathematics, and was "nearly advanced proficient in science." (*See* ALJ Decision at 16.)

The ALJ found that the NJASK was administered to M.M. in accordance with her accommodations.  However, after considering testimony from Tighe and Fenster-Kuehl, and reviewing the sample NJASK text and questions, the ALJ found that while the NJASK may provide some insight into M.M.'s skills and knowledge, its assessment of Language Arts Literacy, which includes reading and writing, was impacted by the utilization of a scribe.  Absent other evidence of progress, the ALJ found that the NJASK scores could not serve as the sole indicator that M.M. progressed during fourth grade.  (*See* ALJ Decision at 17.)

The ALJ noted that contrary to the District's contention that M.M. was "'nearly advanced proficient' in science, the results disclose that M.M. was nearly only partially proficient in the other two areas, as her scores of 200 are the lowest possible proficient scores." (*See* ALJ Decision at 16.)  Furthermore, the ALJ took into account Fenster-Kuehl's testimony that M.M.'s performance on NJASK revealed that when comprehension questions are read to her, she is able to make use of the bits and pieces she understood from her reading, of her demonstrated verbal narrative ability, and of the cues provided in the questions to guess with some accuracy the correct answers.  (*See id.*)  According to Fenster-Kuehl, this is not an unusual finding for a child who has good verbal IQ, but cannot read.  (*See id.*)  The ALJ also took into account Tighe's testimony, which was that having the test questions read aloud to M.M. would inflate M.M.'s scores.  (*See id.*)  Also, since M.M. was permitted to dictate her answers on the writing portion of the NJASK, the test did not assess her writing skills, but rather, her oral language skills.  (*See id.* at 16-17.)

Defendant argues that the ALJ's finding should be reversed because Defendant merely provided M.M. with legally required accommodations for her disability while taking the test. (*See* Def.'s Br. 17.)  Further, since the accommodations were appropriate, M.M.'s NJASK results

should be taken to demonstrate that M.M. "passed" a fourth grade curriculum.  (*See id.* at 16.)  In particular, Defendant relies on *M.P. v. S. Brunswick Bd. of Educ.*, 2008 WL 5412915, at *8 (D.N.J. 2008) to support its claim that "the NJASK is a reliable factor in determining the benefit of an educational placement for a child."  (*See* Def.'s Br. 16.)

Plaintiffs argue that M.M.'s NJASK scores were not a true assessment of her skills in the areas the test was meant to assess because of the accommodations provided by the District.  (*See* Pls.' Br. 16.)  For example, in the writing section, M.M. was not required to write.  Instead, she was permitted to dictate her responses to a scribe.  Thus, the assessment of her writing language abilities was instead turned into an assessment of M.M.'s oral language abilities.

Plaintiffs also take issue with the fact that M.M. was not required to read the reading comprehension questions on the NJASK.  Rather, the questions and possible multiple choice answers were read aloud to her.  Plaintiffs point to Fenster-Kuehl's testimony that the accommodation provided could give M.M. clues to respond with the correct answers even though her weak decoding skills would not have permitted her to read or comprehend the corresponding passages.  For these reasons, they argue that the NJASK scores were "neither persuasive nor reliable evidence that M.M. progressed in the District's program."  (*See* Pls.' Br. 18.)

It is undisputed that M.M.'s learning disability is dyslexia.  Thus, the ALJ's analysis was appropriate in focusing on the administration of the Language Arts Literacy portion of the NJASK, rather than the Mathematics and Science portions.  This Court agrees with the ALJ's determination that the accommodations rendered the assessment a poor indicator of M.M.'s reading and writing skills progress.

Additionally, though the Defendant notes that courts have used NJASK results as a factor in determining the successfulness of an IEP, *M.P. v. South Brunswick Board of Education* does not claim that NJASK results are dispositive. Rather, that case recognized NJASK as one factor among many to be considered when determining whether unilateral placement in a private institution was proper. Thus, the instant case is distinguishable from *M.P.* and does not support Defendant's argument in such a way as to find reversible error in this instance.

iv.     *Progress Report for 2008-2009 School Year (Report Card)*

The ALJ found that M.M.'s report cards were not reliable indicators of her academic achievement or progress for two main reasons. First, the ALJ relied on testimony from Gacki and Bonkoski that M.M.'s grades were not a reflection of her academic achievement alone. Second, the ALJ took into consideration that private testing showed that M.M. was "essentially unable to decode printed words at all," and that M.M. was reading below the first percentile for both key types of word reading ability, and was unable to read even first-grade-level passages independently with any level of functional accuracy or fluency. (*See* ALJ Decision at 19.) This could not be reconciled with M.M.'s "Language Arts" grades in November, which were "A-" (Reading), "B" (Spelling), "B" (English), and "Outstanding" (Handwriting).[11] Nor could the independent evaluations be reconciled with her "Language Arts" grades in January, which were "A-" (Reading), "B+" (Spelling), "B+" (English), and "Outstanding" (Handwriting). Furthermore, since the report card grades were not based solely on oral or written tests, but were from "multiple measures," such as "homework completion, class participation, and formative assessments," they were less objective indicators of M.M.'s progress. (*See id.* 18.)

---

[11] The report card allows for grades of A (Excellent), B (Good), C (Satisfactory) and D (Unsatisfactory), as well as O (Outstanding), S (Satisfactory) and N (Needs Improvement). (ALJ Decision at 17.)

The Defendant argues that the ALJ's decision should be reversed because it "largely ignore[ed] or over[looked] the staff's opinions of M.M.'s achievements."  (*See* Def.'s Br. 20.) Furthermore, Defendant relies on *Rowley* to argue that "[a]cademic progress, when considered with the special services and professional consideration accorded" is dispositive in determining educational benefit.  *Rowley*, 458 U.S. at 203, n.25; *id.* at 207, n.28; *see also M.P.*, 2008 WL 5412915, at *8; *P.D. v. Franklin Twp. Bd. of Educ.*, 2006 WL 753152 (D.N.J. 2006).

Plaintiffs reiterate that M.M.'s fourth-grade grades were not consistent with her abilities as assessed by Tighe's reading, writing, and spelling assessment or the District's own math assessments.  Tighe's assessment showed that M.M. could not manage first grade reading passages at the end of the fourth grade; yet, she received an "A-" in reading on her final report card.   Furthermore, her report card grade in math ("B+") was inconsistent with the District's assessment that she was only proficient in 33 percent of the skills she was supposed to have secured by the end of the fourth grade.  (*See* R. at 35.)  This showed a regression from the 54 percent proficiency she had at the beginning of the year.  Based on independent evaluations, as well as the District's own evaluations of M.M.'s skill level, Plaintiffs argue that the report card grades were unreliable indicators of progress.

This Court upholds the ALJ's finding that M.M.'s report card grades were not reliable indicators of her academic achievement or progress.  First, under the modified *de novo* standard of review, this Court must give due weight to the ALJ's determination, especially with regard to the weighing of testimonial evidence.  Upon comparing the report card grades and testimonial evidence from M.M.'s teachers and independent evaluators, the ALJ determined that the report cards, alone, were not reliable indicators.  There was far too much contradictory evidence and evidence of subjectivity in grading to find that the report cards were reliable.

Second, though Defendant uses *Rowley* to argue that grades and advancement from grade to grade serve as a strong indicator that a FAPE is being received, it is clear that *Rowley* does not stand for this proposition.  Rather, the Court in *Rowley* plainly stated:

> We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a "free appropriate public education."  In this case, however, we find [the student's] academic progress, when considered with the special services and professional consideration . . . to be dispositive.

*Rowley*, 458 U.S. at 203.  From its text, it is clear that *Rowley* did not evince a standard that must be applied uniformly to all cases.  Thus, in the instant matter, this Court holds that the ALJ findings were not erroneous.

   *v.*   *Gray Oral Reading Test-4 (GORT)*

M.M. was tested with the GORT in the spring of 2008 and again in the spring of 2009 by Kaufman and Tighe, respectively.  (*See* P-21.)  The GORT is used for diagnosis and progress monitoring of reading abilities.  A student is presented with a printed passage and asked to read aloud.  The reading is timed and miscues are recorded.  (*See* ALJ Decision at 19.)  Thereafter, without referring to the original text, the student must answer five multiple-choice comprehension questions based on the material in the passage.  (*See* P-21 at 11.)  Since Kaufman's report reflected that M.M. was unable to achieve a basal score and since testing was discontinued, the ALJ did not reach a determination as to the comparison of the 2008 and 2009 scores.  (*See* ALJ Decision at 20.)  However, the ALJ used Tighe's 2009 GORT assessment to find that M.M.'s accuracy and fluency were below the first percentile and her rate was in the second percentile. (*See id.*)

Defendants first rely on testimony that the GORT is not widely used in public schools because its focus is too narrow and testimony that "M.M.'s significant deficits made it nearly

impossible to score her results." (*See* Def.'s Br. 20.)  Yet, Defendants then argue that the ability to score M.M. at all by the end of the fourth grade showed progress.  (*See* Def.'s Br. 21.)

Plaintiffs rebut Defendant's argument that M.M.'s GORT results evidence progress. Although the ALJ found that a comparison could not be made between the 2008 and 2009 tests, Plaintiffs rely on various testimony from Tighe, Fenster-Kuehl, Gacki, and Bonkoski that a comparison of the 2008 and 2009 scores showed M.M.'s scores decreased in accuracy, fluency and comprehension.  (*See* Pls.' Br. 23.)

This Court will not attempt to use M.M.'s 2008 GORT scores to assess M.M.'s progression, stagnation, or regression.  It is clear from Kaufman's testimony and from the ALJ's assessment that the 2008 GORT was incomplete.  As such, this Court will neither create a makeshift comparison of the 2008 and 2009 GORT assessments as Plaintiffs suggest, nor will it assume that mere completion of GORT testing in 2009 signifies progression as Defendant suggests.  Furthermore, the Court is not persuaded by Defendant's efforts to both discount GORT testing and use the 2009 GORT to show that M.M. has made progress in her reading abilities.  Thus, the ALJ's consideration of the 2009 GORT, at face value, was appropriate and her finding will be upheld.

> vi.   *Staff v. Expert Testimony as to Progress*

The ALJ found that since the objective data was inconsistent with the Progress Reports, the Progress Reports were deemed to be unreliable indicators of M.M.'s progress.  (*See* ALJ Decision at 23-24.)  Instead, the ALJ relied on the record, including the District's DRA2 results, GORT-4 scores, and the Wilson Assessment of Decoding and Encoding (WADE)[12].  (*See id.* at 24.)

---

[12] Tighe administered WADE in 2009 to gather specific information about M.M.'s current level of spelling.  (ALJ Decision at 24.)  "On the Spelling section of the test, M.M.'s scores were as follows: Words (rule-governed)—6%

Defendant disagrees with the ALJ's decision to weigh expert testimony more heavily for three reasons.  First, Defendants contend that the ALJ improperly ignored testimony from Defendant's staff, which testified as to M.M.'s improvements in writing, spelling, and reading skills.  (*See* Def.'s Br. 22.)  Second, in a related argument, Defendants claim that because the ALJ did not defer to M.M.'s teachers' objective and subjective findings, she "impose[d] an immeasurable and undefined demand upon the District that M.M. progress more than she did, and likely more than was feasible given her deficits."  (*See id.* 28.)  Third, Defendants argue that Plaintiffs' expert testimony "merely confirmed that M.M. had certain limitations[,]" as opposed to proving that she had not progressed.  (*See id.* 22)

Plaintiffs respond that the ALJ duly considered evidence presented by both sides. Defendant's experts were not ignored; rather, Plaintiffs' experts were merely deemed more persuasive.  (*See* Pls.' Br. 28-29.)

Based upon the ALJ's decision, it is clear that testimony from Defendant's staff and Plaintiffs' experts were both taken into account.  The Progress Report, which reflected M.M.'s supposed "significant progress" in reading developmentally appropriate materials with accuracy and speed, and "significant progress" in all other areas were based on objective and subjective standards of measurement.  The Progress Report stood in direct contradiction to the more objective DRA2, GORT and WADE results.  Thus, the ALJ merely found Bonkoski less persuasive in light of the objective evidence presented.

Precedent clearly states that the Third Circuit has "consistently [] declined to adopt bright line rules to determine whether a student is receiving a meaningful educational benefit under the IDEA."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 568 (3d Cir. 2010).  Where results of

---

correct; Sight Words—10% correct; and Sentences—4% correct.  According to Tighe, M.M.'s error patterns are not just developmentally delayed, but are deviant from the norm."  (*Id.*)

objective tests vary greatly from results of subjective grading standards, it would be inappropriate for this Court to contravene the ALJ's determination in favor of M.M.'s teachers' testimony.

> Overall, we think that it is clear that a court should not place conclusive significance on special education classroom scores . . . [because] there may be a disconnect between a school's assessment of a student in a special education setting and his achievements in that setting and the student's achievements in standardized testing. When there is such a disconnect we think that there should be an especially close examination of the appropriateness of the student's education.

*Id.*  In the instant matter, there is clearly a "disconnect" between the staff's assessment and the assessments made by independent evaluations.  Thus, an examination of the appropriateness of M.M.'s education was needed.  This Court finds that the ALJ did just that.

Further, neither the record nor the briefs suggest that Plaintiffs were requiring the District to advance M.M.'s capabilities to meet the level of her peers.  Rather, it appears that they were merely requiring that her education provide some objectively measurable sign of progress considering the deficits and difficulties she faced.  Based on precedent, this Court will not disturb the ALJ's determination that the expert witnesses and their objective tests were more credible than the District's staff witnesses without "a showing that there [is] a good reason to do so" from the District.  *Bayonne Bd. of Educ.*, 602 F.3d at 568.

### vii.    *Behavioral Problems & Attention Deficit Hyperactivity Disorder (ADHD)*

Upon reviewing testimony from Gacki and Bonkoski, the ALJ stated that modifications were made during the 2008-2009 school year to assist M.M. with her ADHD.  However, the 2008-2009 IEP was not revised to reflect these modifications.  (*See* ALJ Decision at 25.)  This was remedied in the 2009-2010 IEP, which reflected "an extensive list of [behavioral] interventions and M.M.'s response to such interventions."  (*See id.*; *see also* R-41.)  However,

the ALJ did not reach a definitive finding as to whether the ADHD interventions were effective or whether private school placement was necessary.

Defendant argues that "there was nothing in the record below to suggest that M.M. having ADHD required a private school placement." (*See* Def.'s Br. 23.)  In making this claim, Defendants rely on testimony from Bonkoski and Gacki that M.M.'s behavior "continued to improve." (*See id.*)

Though the ALJ did not explicitly find that M.M. required private school placement based on her ADHD, Plaintiffs infer this based on two factors: (1) that the fourth and fifth-grade IEPs were found to be inadequate, and (2) that neither IEP reflected interventions to address M.M.'s ADHD.  (*See* Pls.' Br. 30.)

Though Defendant does not recognize that M.M.'s ADHD required private school placement, it is clear from the record that M.M.'s behavioral problems were interconnected with her learning disability.  As stated in Bonkoski's written notes, "the quality of M.M.'s comprehension and work products is dependent upon the length of time she is able to attend to a task and her available mental energy . . . ." (*See* ALJ Decision at 25.)  This illustrates the significant impact M.M.'s ADHD had on her ability to learn and function, especially in light of her severe learning disabilities.

Case precedent states that "at a minimum, [t]he IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential. . . .  When a state is unable to provide a [FAPE] to a child but a private school can provide that education, the state must reimburse the child's parents for the private school costs." *R.S. v. Somerville Bd. of Educ.*, No. 10-4215, 2011 WL 32521 (D.N.J. Jan. 5, 2011) (internal citations and quotation marks omitted) (quoting D.S. v. Bayonne Bd. of Educ., 602 F.3d 553 (3d

Cir. 2010).  Based on a preponderance of the evidence, this Court finds that the District failed to provide a FAPE to M.M. such that private school placement was appropriate.  *See* 20 U.S.C. § 1415(i)(2)(C)(i)-(iii) (2006) (directing the reviewing court to grant appropriate relief based on a preponderance of the evidence); *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 802 (3d Cir. 2007) (en banc); *Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1034 (3d Cir. 1993).  Thus, Plaintiffs must be reimbursed for M.M.'s out-of-district placement.

viii.    *Mainstreaming and Least Restrictive Environment*

The ALJ found that Tighe and Fenster-Kuehl "testified credibly that mainstreaming M.M. in a general education setting with her current program would prevent M.M. from remediating her disability and would reduce her self-esteem and self-confidence."  (*See* ALJ Decision at 25-27.)  Reliance upon this testimony was based largely on three factors.  First, M.M. required an "intensive, individualized educational programming."  Second, mainstreaming would require "significant excision, modification and adult intervention."  Third, even if the ALJ were to believe the District's assessment that M.M. had reached a third-grade reading level, this would mean that M.M. would be starting the fifth grade at a two-year disadvantage.  (*See id.*) Thus, the ALJ ultimately concluded that "the District's program to educate M.M. in mainstream classes was not the LRE appropriate for M.M."  (*See id.* 32.)

Defendant claims that M.M. was "thriving in the mainstream program," and thus, a least restrictive environment required that M.M. continue her education in-district.  (*See* Def.'s Br. 26.)  Defendant argues that the ALJ adopted a position contrary to law when she determined that, despite M.M.'s successes in a mainstream environment, mainstreaming was "not the right approach for most special education students."  (*See* Def.'s Br. 24.)

Defendant also claims that M.M.'s in-district placement provided a FAPE in a LRE because it provided M.M. with mainstreaming.  In making this argument, Defendant relies upon *Oberti v. Clementon Board of Education*, 995 F.2d 1204, 1215 (3d Cir. 1993), where the Third Circuit adopted the Fifth Circuit's two-part test to determine whether a school complied with the IDEA's mainstreaming requirement.  Under *Oberti*, a court must first determine whether education in the regular classroom, "with the use of supplementary aids and services, can be achieved satisfactorily."  Where a court finds out-of-district placement necessary, that court must decide "whether the school has mainstreamed the child to the maximum extent appropriate."  *Id.*

Plaintiffs respond that in order to provide a LRE, the District must first provide an appropriate program.  Since the program provided was not appropriate, it failed to provide a LRE.  (*See* Pls.' Br. 31.)  Plaintiffs further contend that under these circumstances, M.M. was given an education in the "most restrictive" environment because she lacked the "academic skills necessary to successfully manage the curriculum requirements of general education classes." (*Id.* 32.)  Plaintiffs also rebut Defendant's claim that the ALJ's determination was contrary to law.  (*See id.* 33.)  They argue that the ALJ's finding as to the inappropriateness of mainstreaming was specific to M.M., her disabilities, and this circumstance rather than all disabled students in all circumstances.  (*See id.*)

The District has failed each level of the two-part *Oberti* test, and has thus violated the IDEA.  The District has failed to show that M.M. can be educated satisfactorily in the regular classroom, supported by supplementary aides and services.  *See Oberti*, 995 F.2d at 1215.  In determining whether a child can be satisfactorily educated in a regular classroom with supplementary aids and services, courts are asked to consider several factors, including:

> (1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational

> benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class.

*Id.* at 1217-18.  This Court finds the second factor to be highly dispositive based on the record and based on the ALJ's Decision.  *Oberti* notes that "[t]he court will have to rely heavily . . . on the testimony of educational experts" while taking into consideration the "unique benefits the child may obtain from integration in a regular classroom."  *Id.* at 1216.  The ALJ Decision relied on expert testimony from Tighe and Fenster-Kuehl, both of whom determined that education in a regular classroom would not be satisfactory.  The ALJ also considered the "unique benefits" of integration in a regular classroom, *id.*, which would typically include the development of social and communication skills and increased self-esteem.  However, the expert testimony claimed that in M.M.'s case, continued education in a regular classroom would be more detrimental than beneficial in these respects.  Thus, the record below supports the determination that out-of-district placement was appropriate.

While this Court finds that out-of-district placement was appropriate for M.M., here, the District failed to remove her from the regular classroom to provide education in a segregated, special education class.  *Oberti* only requires a court to consider the second prong of the mainstreaming test—whether the school has included the child in programs with nondisabled children to the maximum extent appropriate—if the court "determines that the school district was justified in removing the child from the regular classroom and providing education in a segregated, special education class."  *Id.* at 1218.  Here, the District did not segregate M.M., but instead had her in a regular classroom; therefore, this Court's analysis need not reach the second prong of the *Oberti* test as it is inapplicable to this case.

As discussed above, the District failed to provide a meaningful educational benefit through the use of its IEP.  Even with its supplementary aids and services, the District has not provided M.M. with a meaningful educational benefit as the term is used in the IDEA. Therefore, Defendant failed to provide M.M. with a FAPE in a LRE.   *See M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345 (D.N.J. 2002).

> ix.      *Proposed Placement Provided a FAPE in Least Restrictive Environment*

The ALJ determined that despite some minor changes and modifications to the 2009-2010 IEP, the IEP for M.M.'s fifth-grade education had a very similar plan.  (*See* ALJ Decision at 29.)  Where the 2010-2011 plan was essentially the same as the prior year's plan, the IEP was not appropriate, did not provide M.M. with a FAPE, and did not provide placement in the LRE that would provide M.M. with a meaningful educational benefit.  (*See id.* at 33.)

Plaintiffs argue that a determination as to the adequacy of the Winston School was not necessary because the District had already stipulated that out-of-district placement would be proper if it was determined that the District failed to provide a FAPE.  (*See* Pls.' Br. 36.) Plaintiffs also assert that since they acted reasonably in unilaterally placing M.M. at the Winston School, they should not be denied reimbursement.  (*See id.*)

As Defendants do not address the adequacy of placing M.M. at the Winston School, but rather choose to relitigate the finding that in-District placement failed to provide a FAPE, this Court affirms the ALJ's determination that unilateral placement at Winston School for 2009-2010 and for 2010-2011 was appropriate.  (*See* ALJ Decision at 33.)  As such, Plaintiffs should be granted reimbursement.

> D.      *Plaintiff's Motion for Summary Judgment*

Plaintiffs have moved for Summary Judgment seeking (1) attorney's fees, costs, and interest, (2) tuition costs for M.M.'s unilateral placement at the Winston School for the 2009-2010 year and the 2010-2011 school year, and (3) transportation costs to and from the Winston School for the 2009-2010 year and the 2010-2011 school year.

As Plaintiff's motion is unopposed by Defendant,[13] Plaintiff's motion for summary judgment is **GRANTED**.

## VI.    CONCLUSION

For the reasons stated above, this Court **DENIES** Defendant's Motion for Summary Judgment and **AFFIRMS** the ALJ's findings in all respects.  This Court also **GRANTS** Plaintiffs' request for attorney's fees, costs, and interest incurred from the below administrative proceeding and attorney's fees and costs arising from the instant action.  If the parties are unable to agree as to these fees and costs, Plaintiffs shall submit a certification, with appropriate documentation, seeking such fees and costs.

s/Susan D. Wigenton, U.S.D.J.

Orig:   Clerk
Cc:     Madeline Cox Arleo, U.S.M.J.
        Parties

---

[13] Furthermore, as discussed above, it has already been stipulated that out-of-district placement would be proper if it was determined that the District failed to provide a FAPE,